UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARY HART | § | |
| | § | |
| Plaintiff, | § | Civil Action No.  4:18-cv-00504 |
| | § | |
| v. INTERCONTINENTAL | § | |
| | § | **JURY TRIAL DEMANDED** |
| | § | |
| TERMINALS COMPANY, LLC | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff, Mary Hart files her First Amended Complaint against Defendant Intercontinental

Terminals Company, LLC ("ITC"), and in support would show as follows:

### PARTIES

1.      Plaintiff Mary Hart is an individual residing in Harris County, Texas.

2.      Defendant ITC is a Delaware corporation with its principal place of business in

Harris County, Texas.  ITC has appeared and answered.

### JURISDICTION AND VENUE

3.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because

the case is based on The Equal Pay Act, 29 U.S.C. § 206(d), Title VII, as amended, 28 U.S.C. §

2000(e) *et. seq.* a federal statute, and pursuant to 28 U.S.C. § 1337 because the action is based on

a federal statute regulating commerce.  The Court also has ancillary jurisdiction to hear plaintiff's

claim for wrongful termination.

EXHIBIT A

4.      Venue is proper in the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1391 because ITC committed all or a substantial portion of the unlawful employment practices in Deer Park, Harris County, Texas, located within the Southern District of Texas – Houston Division.

## NATURE OF THE CASE

5.      This case arises from ITC violating The Equal Pay Act, 29 U.S.C. § 206(d).  ITC unlawfully discriminated and retaliated against  Hart because of her gender.  It discriminated and retaliated against Hart by, among other things, ostracizing, marginalizing, threatening, verbally abusing and intimidating her.  ITC had a practice not to treat females fairly, provide them equal opportunity for advancement or pay them the same or similarly to their male counterparts.

6.      Additionally, Hart was constructively discharged for refusing to commit an illegal act that could have subjected her to criminal penalties.

## STATEMENT OF FACTS

7.      Defendant operates a large quantity storage facility in Deer Park, Texas, providing terminal services to the petrochemical industry ("ITC Deer Park").  Its field operations involved 239 tanks with a capacity of nearly 13 million barrels.  It stored hazardous materials and petrochemical liquid and gas, as well as fuel oil, bunker oil, and distillates.  ITC's facilities include multiple ship and barge docks, rail and truck access, and pipeline connections.

8.      ITC employed Hart from March 6, 1990 to November 19, 2017.

9.      ITC constructively terminated Hart on November 19, 2017.  Hart resigned effective November 19, 2014 because no reasonable person would have continued to work under the conditions being imposed by ITC; therefore Hart was constructively discharged.

10.      ITC first employed Hart as an Environmental Lab Technician.

11.      ITC employed at least three hundred employees at ITC Deer Park.  Hart was the only ITC female field operations employee.[1]

12.      Within three months of ITC hiring Hart, ITC transferred all the male employees working in the lab to other positions, leaving Ms. Hart to run the lab alone.  Although Hart was being required to perform the job duties previously being performed by multiple employees, she was not given any increase in salary.

13.      Over the years, ITC gave Hart occasional, small pay raises, but it never promoted her to management  or supervisory positions despite her repeatedly applying for promotions and other jobs for which she was imminently qualified.  ITC always promoted males to these positions although the promoted males were almost always less qualified and experienced.

14.      On or about January 5, 2015, ITC told Hart it was promoting her to the Hazardous Waste Specialist position vacated by another male employee, who was promoted to Lead Environmental Supervisor.  ITC told Hart that it would not transition her to the specialist position or increase her pay (commensurate with the promotion) until she completed training her replacement and completed training for the specialist position.  ITC gave both males (the man who was promoted over Hart and the man who Hart was required to train) pay raises  before either completed training for their new positions.

15.      On or about March 12, 2015, Ms. Hart officially assumed her new position as Hazardous Waste Specialist, but she continued to work with Bass for purported additional training, such training being unnecessary and merely a pretext for refusing her a pay raise.  Hart had backed-

---

[1] ITC employed other females during Ms. Hart's 28-year tenure but only in administrative capacities.

up the Hazardous Waste Specialist position for 12 years, substituting for the position any time the hazardous waste specialist was vacationing or sick.  Moreover, Hart had more required licenses for the position than her predecessor.

16.     Finally, on or about April 28, 2015, Hart completed "training" with Bass. Although ITC had promised Hart that she would receive a raise after she completed her "training" ITC refused to give her the promised raise.

17.     Hart made multiple complaints to ITC's human resources department about gender discrimination and the unfair treatment she was receiving from Carl Holly, VP.  Holly was involved in all personnel decisions for the Environmental and Safety Departments at the Deer Park facility, even though he had no expertise in handling environmental waste products  Human Resources did not conduct any investigation, nor did they take any corrective action in response to Hart's complaints.  Moreover, Hart made multiple complaints to her supervisor that she was not being paid in parity with her male counterparts.

18.     In April 2017, ITC was looking for a manager for a Lead Environmental Specialist. Hart applied for the job but was denied the promotion.  Hart was subsequently told by a member of the human resources department that Alice Richardson, the Director of Human Resources had said that Hart would not be promoted because Hart would have to participate in meetings with all men and "she couldn't handle it."

19.     In June 2017, Frank Elliott, Manager/ Supervisor of the Environmental Department told Holly, that the individual who was performing as Lead Environmental Specialist was not qualified for the job.  The manager asked that the Lead be reassigned, and that Hart be made Lead. Holly denied the request, stating, "Well that's NOT going to happen."

20.     In late August or early September 2017, ITC notified the employees in the Environmental Health and Safety Department that the Environmental Supervisor position was open, and anyone interested should apply.  Hart immediately contacted ITC's Human Resources Department and asked for the job description and eligibility requirements.  The descriptions she was given did not require a college degree for the position.  After Hart asked for the application, Human Resources added the requirement that applicants have a college degree.  Hart met all the other requirements except for the "new" college degree requirement.  Hart was told she was not eligible and could not apply.

21.     In late September or early October 2017, ITC hired Brian Obermeyer for the position.  Obermeyer held no licenses and had no experience in handling hazardous waste.  Obermeyer was so unqualified that Holly required Hart prepare Obermeyer's reports because he was incapable of preparing them.

22.     ITC denied Hart's vacation requests if a male employee requested vacation leave at the same time, even though Hart did not work in the same position as the male employee.  ITC consistently granted its male employee's vacation and sick days upon request.

23.     ITC denied Hart step-up pay—a temporary increase in pay rate whenever an employee fills in for another employee who is paid at a higher hourly rate.  ITC consistently paid its male employees step-up pay.

24.     ITC either denied or severely limited Hart's overtime.  ITC consistently granted and paid its male employees overtime as needed or wanted.  Hart performed exceptionally in every position she held with ITC.  She attended numerous continuing education courses obtaining specialized certifications and licenses.  Hart was not given any increases or promoted for these

achievements; however, her male counterparts received additional pay, advancement or other benefits.

25.     Male employees who Hart trained earned higher wages/salary than Hart during the period she trained them and when ITC promoted them over her.

26.     ITC's actions, and inaction, created a "boys only" club where it allowed only male employees to advance.

27.     On August 25, 2017, Hurricane Harvey hit the Houston area resulting in massive flooding. Hart was working in the Environmental lab on August 28-30, 2017. Holly called Gerry Baquet, the lead environmental operator (who was not scheduled to work) into the facility and told him to release the hazardous material being stored in ITC's tanks into the flood water. On information and belief, Holly called Baquet in because he knew Hart would refuse to make an illegal release. Hart told Baquet that it was illegal to make a release. Baquet, in Hart's presence, called Holly on three occasions to question his request that Baquet release the material. Holly became angry and told him to make the release.

28.     An intentional release of toxic waste violates both state and federal law. ITC was operating under Hart's license, which could make her subject to criminal and civil liability for an unauthorized release. Hart took water samples of the outfall and pictures of the release over the three days that the release occurred. She sent the sample to the laboratory for analysis. During the three day period, over a million gallons of toxic waste was intentionally released into the flood waters by ITC.

29.     On the evening of August 30, 2017, Carl Holly came into the lab and told those working that the toxicity levels in the outflow were within acceptable levels. Hart knew that this

was untrue.  Hart had pulled multiple samples from the outflow and surrounding waters and had

taken pictures of the release.

30.      Within days of Holly's announcement that the toxic levels were within acceptable

levels, Brent Weber, Senior Vice President of ITC and with the representative from Human

Resources held meetings with each of the employees.  When Hart was called in, Weber told her

that during the flooding there had been an inadvertent release of raw sewage.  Hart told Weber she

had been present during the flooding and the release had not been of raw sewage and had not been

inadvertent.  She told also told him that she had tried to stop the release and Holly had expressly

ordered Baquet to make the release.  Hart told Weber that she had pulled water samples and that

after the third call to Holly, she had taken her license off the wall.

31.      Weber responded that the proper report would be made to the Texas Commission

on Environmental Quality ("TCEQ") and that he would let her see it.  He also told Hart that if the

issue of the release ever went to court, she would be the one who would go to jail because it was

her license.

32.      Although Weber had said he would let Hart review the report to the TCEQ, he

never did.  Additionally, when Hart searched ITC's computer records, she was unable to locate the

report.

33.      On November 8 – 9, 2017, Hart was attending fire school in San Antonio.  When

she called the lab to check in, Baquet told her that an employee had accidently overfilled one of

the tanks that resulted in an inadvertent release on hazardous waste.  Hart told Baquet that ITC

needed to remove the soil that had been contaminated.  Baquet agreed but said Holly wanted them

to use a fire hose to dilute the hazardous material and then vacuum up the water.

34.      When Hart returned to ITC on November 10, 2017, she learned that the proper remediation had not been performed; instead, ITC had only sucked up the standing water and had not removed any of the contaminated soil. Hart called Hunter Willis, the Environmental Supervisor, and told him that all of the contaminated soil needed to be removed. Willis contacted Holly to relay Hart's comments and discuss the remediation. Ultimately the site was properly remediated.

35.      Holly had previously told Hart that management blamed her for additional cost of disposal resulting from the cleanout of the Hazardous Waste tank. Holly increased his harassing conduct towards Hart. He instructed Hunter Willis that Hart was to copy him (Holly) on all her correspondence   Holly would bypass Hart and instruct other employees to perform tasks and then blame Hart for their mistakes. He would refuse to sign her reports and continually berated her. Holly's actions towards her were so severe that Hart told her supervisor, Hunter Willis, that she was going to quit. Willis told her not to quit but to go home and he would talk with Holly.

36.      Hart was concerned that Holly was trying to blame her for ITC's failures in connection with the release of hazardous material during Harvey and the failure to remediate the inadvertent release in November 2017. Indeed, ITC had already told Hart that if the TCEQ investigated that she would be the one going to jail, because the facility was operating under her license. On November 17, 2017 Hart reported ITC's activities to the TCEQ.

37.      On November 18, 2017, Hart went by the ITC Deer Park facility and located a copy of the report ITC filed with the TCEQ in connection with the release during Harvey. Contrary to the facts, the report claimed that the release of the hazard material was "inadvertent," when in fact it was intentional.

38.     After learning that ITC had lied to her concerning the report filed with the TCEQ, and the overt threat that ITC would try to place blame the release on her, Hart tendered her resignation.

## VIOLATION OF EQUAL PAY ACT

39.     Paragraphs 6 through 38 are incorporated herein by reference.

40.     ITC is an "employer" within the meaning of 29 U.S.C. § 203(d).

41.     Hart, a female employee, was paid less than male employees performing the same or similar jobs requiring similar skill, effort, and responsibility in similar working conditions. Hart received lower hourly wage or salary, overtime pay, bonuses, paid vacation and holidays, benefits, and other forms of compensation than similarly situated male employees.

42.     The acts, failures, practices and policies of ITC set forth above constitute willful discrimination with respect to salary, bonuses, and all other forms of compensation and benefits paid or provided to females versus males for substantially equal work on jobs requiring equal skill, effort and responsibility and performed under similar working conditions in violation of the Equal Pay Act ("EPA") of the Fair Labor Standards Act, 29 U.S.C. § 206(d).

## VIOLATION OF TITLE VII (Sex Discrimination)

43.     In September 2017 Hart applied for the position of Environmental Supervisor. The job description she was originally provided did not require a college degree. After Hart indicated that she was interested in applying for the position, the job description was changed to require a college degree and Hart was told she was ineligible to apply. A male candidate with less experience and who did not possess the required license was given the position.

44.     Hart was objectively the better qualified candidate and was denied the position due to her gender.

## CONSTRUCTIVE DISCHARGE UNDER THE TEXAS PUBLIC POLICY EXCEPTION TO "AT WILL" EMPLOYMENT

45.     The Texas Supreme Court has recognized a public policy exception to the employment at will doctrine for individuals that are terminated for the sole reason that they refused to perform an act that would expose them to risk of criminal prosecution.  *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733, 28 Tex. Sup. Ct. J. 339 (Tex. 1985).  That exception also applies when an employee resigns their employment as a result of a constructive discharge.

46.     Texas Water Code Chapter 7, Subchapter E provides for criminal penalties for allowing an unauthorized discharge of hazardous material or failing to report an unauthorized discharge.

47.     Hart was told that ITC had reported an "inadvertent" discharge of raw sewage into the flood waters caused by Hurricane Harvey.  Hart told Brent Weber, Senior Vice President of ITC, that she was present when the discharge occurred and it was not "accidental" or "inadvertent" and that it was not raw sewage rather it was toxic waste.  Weber threatened to implicate Hart in the criminal conduct and told her that that if she reported what happened she would be the one who would go to jail because it was her license.

48.     Weber ultimately told Hart that ITC would file a report notifying the TCEQ of the discharge.  Weber told Hart that he would show her the report; however, the report she was shown was subsequently altered to categorize the discharge as "inadvertent."  When Hart learned that a false report connected to her license has been filed, she resigned her position.

## JURY TRIAL DEMANDED

49.     Ms. Hart demands a trial by jury on all triable issues.

## REQUEST FOR RELIEF

Ms. Hart respectfully requests that upon trial of this cause, grant judgment in Ms. Hart's favor and against the ITC for:

a.  Lost wages from November 19, 2017;

b.  compensatory damages for the difference in pay between Hart's salary and that of male employees performing equivalent work;

c.  front pay;

d.  liquidated damages for Defendant's willful violations of the Equal Pay Act;

e.  mental anguish damages;

f.  punitive damages;

g.  attorneys' fees and costs of the suit; and

h.  such other relief as this Court deems equitable and just.

Respectfully submitted,

**THE GREENWOOD LAW FIRM, PLLC**
*/s/ Sean Greenwood*
Sean Greenwood
Attorney-in-Charge
State Bar No. 08408730
SDTX ID:  15015
1415 N. Loop W., Suite 1100
Houston, Texas 77008
TEL: (832) 356-1588
FAX: (832) 356-1589
EMAIL: sean@gwoodlaw.com

ATTORNEY FOR
PLAINTIFF MARY HART

OF COUNSEL

Linda D. King
GORANSONKING, PLLC
State Bar No. 11455600
SDTX ID 6060
1415 N. Loop W., Suite 1100
Houston, Texas 77008
TEL: (713) 526-9200
FAX: (713) 526-9202
Email: king@goransonking.com

ATTORNEY FOR PLAINTIFF

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing documents was served on counsel of record through the electronic filing system for the U.S. District Court for the Southern District of Texas on this 17th day of December 2018.

*/s/ Sean Greenwood*